IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

ANR CONSTRUCTION, INC.,

          Plaintiff,

v.                                              CIVIL ACTION NO. 2:21-cv-00575

CPF CONSTRUCTION, LLC,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant CPF Construction, LLC's motion for summary judgment. (ECF No. 92.) For the reasons more fully explained below, the motion is **GRANTED** in part and **DENIED** in part.

*I.    BACKGROUND*

A.  Facts[1]

On June 23, 2016, West Virginia experienced a series of state-wide thunderstorms that dumped roughly 10 inches of rainfall within a 24-hour timeframe.[2] Widespread flash-flooding

---

[1] The parties agree that this case is best understood when viewed against the backdrop of West Virginia's recovery efforts following the 2016 flood. That said, the record before the Court is silent on much of that background and the parties take much of it for granted. As a result, the Court takes a moment to fill in these gaps and provide the reader with the context that gave rise to this litigation. The Court notes that the flooding disaster of 2016 was so catastrophic and well-known in southern West Virginia that the Court also can and will take judicial notice of all of this indisputable background information.

[2] *Remembering the 2016 Flood Five Years On*, W. Va. Dep't of Transp. (June 23, 2021), https://transportation.wv.gov/communications/PressRelease/Pages/Remembering-the-2016-flood-five-years-on.aspx.

1

followed.[3]   As a result, thousands of homes had been flooded, destroyed, and even swept away.[4] Thousands more were without power.[5]   Twenty-three people were killed.[6]

A state of emergency was soon declared, and West Virginians began picking up the pieces and rebuilding.[7]   In the months that followed, the State received $149 million in federal funding, all of which was earmarked for flood relief.[8]   The State used these funds to start the RISE Housing Program ("RISE program"), which it introduced in 2017.[9]   As relevant here, the RISE program helped West Virginians rebuild their homes by providing the necessary labor and funding.[10]

The RISE program had a defined structure.   At the top was the West Virginia National Guard ("National Guard"), who oversaw the program.[11]   Below the National Guard were four different general contractors, who the State hired to divide up and build the 1,000[12] or so houses.[13] Thompson Construction, Inc. ("Thompson") was among those general contractors.[14]   Thompson,

---

[3] *The Historic and Devastating Floods of June 23rd 2016*, Nat'l Weather Serv., https://www.weather.gov/rnk/2016_06_23_Flood (last visited May 31, 2024).
[4] *Remembering the 2016 Flood Five Years On*, *supra* note 2.
[5] *See The Historic 2016 Late June Flooding Event in West Virginia*, Nat'l Weather Serv., https://www.weather.gov/rlx/2016-historic-june-flooding#:~:text=Event%20Summary&text=Sadly%2C%20flash%20flooding%20across%20the,over%20the%20Ohio%20Valley%20Region (last visited June 4, 2024).
[6] *Id.*
[7] Carrie Hodousek, *Tomblin Issues State of Emergency for 44 Counties*, W. Va. MetroNews (June 23, 2016, 10:05 PM), https://wvmetronews.com/2016/06/23/tomblin-issues-state-of-emergency-for-44-counties/.
[8] *See New Rise WV Funding to Help Those Impacted by June 2016 Flood*, Ready WV, https://ready.wv.gov/news/Pages/New-funding.aspx (last visited May 31, 2024).
[9] *RISE West Virginia Disaster Recovery Program Kickoff*, W. Va. Exec. (Aug. 2, 2017), https://wvexecutive.com/rise-west-virginia-disaster-recovery-program-kickoff/.
[10] *Id.*
[11] *RISE West Virginia Program Update on Four-Year Anniversary of 2016 Flood*, W. Va. Nat'l Guard (June 23, 2020), https://www.wv.ng.mil/News/Article/2229941/rise-west-virginia-program-update-on-four-year-anniversary-of-2016-flood/.
[12] Steven Allen Adams, *RISE West Virginia: Making Heads and Tails of the Botched Flood Relief Effort*, Parkersburg News & Sentinel (July 1, 2018), https://www.newsandsentinel.com/news/local-news/2018/07/rise-west-virginia-making-heads-and-tails-of-the-botched-flood-relief-effort/.
[13] *RISE WV Announces Contractors for June 2016 Flood Recovery*, W. Va. Exec. (Nov. 1, 2017), https://wvexecutive.com/rise-wv-announces-contractors-june-2016-flood-recovery/.
[14] *Id.*

however, needed a subcontractor, and it later hired Defendant for that role. (ECF No. 96-1 at 25:1–14.) But Defendant apparently needed its own subcontractor to actually build its allotted houses. Defendant chose Plaintiff—a small West Virginia construction company with a half-dozen or so employees—and Defendant soon began recruiting Plaintiff to join the RISE program. (*Id.* at 10:12–11:7, 12:18–13:2.)

Defendant's recruiting efforts proved successful, and the two parties struck a deal on March 28, 2019. (ECF No. 96-3.) They memorialized their agreement in a 10-page binder agreement ("binder agreement" or "the contract"), which outlined their respective obligations. (*Id.*) As relevant here, the binder agreement provided that Plaintiff would build 125 stick-built homes. (*Id.* at 2.) However, this number was not set in stone. Defendant retained the right to increase or decrease the number of houses at any time. (*Id.*) As for payment, the parties agreed that Defendant would pay Plaintiff in three roughly equal installments.[15] (*Id.* at 5–6.) The first third would be due once Plaintiff completed the foundation on each house, the second portion would be due once the house was "roughed in," and the final payment would be due once the house was finished. (*Id.*) The binder agreement also contained an insubordination clause, which, as the name suggests, gave Defendant the right to remove Plaintiff if Plaintiff became insubordinate. (*Id.* at 7.) Importantly, however, the binder agreement contained no timetable as to when any one house or set of houses needed to be finished. (*See generally id.*) Nor did it contain a clause saying time was of the essence. The contract was entirely silent as to Plaintiff's allotted time to perform.

---

[15] The amounts varied slightly, depending on which phase of the house Plaintiff completed. (*See* ECF No. 96-1 at 37:2–14.)

The parties may have signed their contract in late March, but Plaintiff had to wait a while before it could begin work. (ECF No. 96-2 at 21:5–10.) This delay occurred for two main reasons. First, another contractor had yet to finish tearing down the houses that Plaintiff was assigned to rebuild. (ECF No. 96-1 at 29:3–7.) Second, once those old homes were torn down, the lots still needed to be cleared and surveyed. (ECF No. 96-2 at 21:20–22:7.) This prep work took five or six weeks in all, so Plaintiff could not begin until mid-May.[16] (*See* ECF No. 96-2 at 22:1–3.)

Plaintiff promptly began work then but soon experienced setbacks beyond its control. For example, when Plaintiff began working on the footers and foundations at multiple homes, it discovered debris—such as bicycles and old housing materials—buried underground. (ECF No. 96-1 at 95:21–96:22.) As it turned out, the other contractor did not haul off this debris, but instead buried it on-site. (*Id.*) So Plaintiff had to haul off the debris itself before it could even begin working on the footer and foundation. (*Id.* at 98:9–99:1.) Even when Plaintiff was able to make progress, Thompson—who was higher up the food chain—would sometimes assign Plaintiff extra tasks that took men away from building homes. According to Randy Young, Plaintiff's owner, Thompson would "ask" Plaintiff's employees to go trim trees somewhere or put a roof on a shed. (*See, e.g.*, *id.* at 47:18–48:12.) This, of course, did nothing to help build a house. But, as Mr. Young explained in his deposition, when the "boss man tells you to do it, you do it." (*Id.* at 49:13.)

Despite these setbacks and impromptu side-jobs, Plaintiff progressed on the houses, and matters seemed to be going well. By the end of September, Plaintiff had built three houses

---

[16] Defendant does not, nor could it, fault Plaintiff for these delays. (ECF No. 96-2 at 22:12–23:3.)

without complaint.  (ECF No. 96-1 at 174:17–20.)  The first house was completed in 94 days.  (ECF No. 96-2 at 30:21–23.)  The second took 96 or 98 days.  (*Id.* at 30:23.)  The third was finished within 107.  (*Id.* at 31:3–4.)   Plaintiff also had two more houses 99 and 91 percent complete, respectively, (ECF No. 92-2 at 2, 9), and eight more in various stages, though each were under roof, (*see* ECF No. 96-1 at 53:23–54:1).  Defendant was upholding its end of the bargain, too.  The record shows that Plaintiff regularly submitted invoices to Defendant (which included charges for Thompson's side-jobs), and Defendant paid each invoice.[17]  (*Id.* at 44:19–23.)  On more than one occasion, Defendant even advanced Plaintiff money so that Plaintiff could keep the operation moving along and order materials for the next stage of a house, even though the binder only provided for reimbursement of costs.[18]   (ECF No. 96-2 at 51:24–52:8.)

      That changed at the end of September.   Seeing how more than three years had passed since the flood, and many West Virginians were still without homes, political pressure began to mount on the National Guard and other government officials to speed things along.  (*See* ECF No. 96-2 at 45:19–46:6.)  That pressure worked its way down to Defendant.  (*Id.*)  Suddenly, Defendant felt that Plaintiff was taking too long to complete houses.  So, on September 28, 2019, Defendant told Plaintiff not to begin any new homes until it finished the 10 already in progress.  (ECF No. 92-1 at 13.)  Some of Plaintiff's employees nonetheless broke ground on a new house a few days later.  (ECF No. 96-1 at 55:15–56:5.)  Defendant found out and terminated Plaintiff.  (ECF No. 92-1 at 13.)  In a written letter dated October 3, 2019, Defendant informed Plaintiff that it was being fired for insubordination and failure to timely support the RISE program.  (*Id.*)  The letter

---

[17] Mr. Young testified in his deposition that Defendant sometimes paid less than the full invoice.  (ECF No. 96-1 at 44:19–23.)   Defendant's reasons for doing so are less than clear.

[18] Defendant gave Plaintiff a $10,000 advance at the very beginning to help get started.  (ECF No. 96-1 at 87:23–88:1.)

5

also said that Defendant would pay Plaintiff for any unpaid work, but that never happened. (*Id.*) This unpaid sum, Plaintiff says, is more than $157,000.[19] (ECF No. 96-1 at 132:4–11.)

B. Procedural History

Plaintiff sued Defendant in the Circuit Court of Kanawha County, West Virginia, on September 27, 2021. (ECF No. 1-1 at 3–12.) Plaintiff's complaint brought six claims: (1) breach of contract; (2) fraud; (3) breach of implied in fact contract; (4) quantum meruit; (5) a request for declaratory relief; and (6) a request for punitive damages, attorneys' fees, and costs. (*Id.*) Also, in the prayer for relief, Plaintiff requested compensatory damages in the amount of $330,980.00.

Defendant removed the action to this Court on October 26, 2021, invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332.[20] (ECF No. 1.) At the close of discovery, Defendant moved for summary judgment on each of Plaintiff's six claims.[21] (ECF No. 92.) Plaintiff filed a timely response in opposition, (ECF No. 95), and Defendant replied, (ECF No. 97). As such, the motion is ripe for adjudication.

II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. It states, in pertinent part, that a court should grant summary judgment if "there is no genuine issue as to any material fact." "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the

---

[19] Mr. Young testified that, prior to Plaintiff's termination, Defendant owed Plaintiff $157,140. (ECF No. 96-1 at 131:18–132:3.) He was unsure, however, what that number tallied to post-termination, though he knew it "was significantly higher than" $157,140. (*Id.* at 132:4–11.)
[20] Plaintiff is a West Virginia corporation with its principal place of business in West Virginia. Defendant is a South Carolina limited liability company whose only two members are both South Carolina citizens. (ECF No. 58.)
[21] Once in federal court, Defendant counterclaimed against Plaintiff, alleging Plaintiff (1) breached the contract and (2) committed fraud. (ECF No. 3.) However, because neither party moved for summary judgment on Defendant's counterclaim, the Court need not discuss it further.

nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). Summary judgment should not be granted if there are factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

The nonmoving party bears the burden of showing there is a "genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence[.]'" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). When ruling on a motion for summary judgment, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

### III. DISCUSSION

Before taking up the parties' arguments, the Court takes a moment to properly frame the analysis. Defendant here has moved for summary judgment on all six of Plaintiff's claims. Plaintiff, in its response, concedes that summary judgment is appropriate on its claims for breach of an implied contract, quantum meruit, and punitive damages. The Court thus **GRANTS** summary judgment to Defendant on those claims. These concessions significantly pare down the case, since only three claims remain live: Plaintiff's claims for (1) breach of contract, (2) fraud, (3) and a declaration that Defendant breached the binder agreement. The Court addresses each in turn.[22]

---

[22] Because the Court is sitting in diversity, West Virginia law governs. *Megaro v. McCollum*, 66 F.4th 151, 159 n.4 (4th Cir. 2023) ("A federal court sitting in diversity applies the substantive law of the state in which it sits.")

7

A. Breach of Contract

In West Virginia, a "claim for breach of contract requires [1] proof of the formation of a contract, [2] a breach of the terms of that contract, and [3] resulting damages." *Sneberger v. Morrison*, 776 S.E.2d 156, 171 (W. Va. 2015). The parties here agree that the binder agreement is a legally enforceable contract between them.[23] (*See* ECF No. 93 at 8; ECF No. 96 at 4.) That's enough to satisfy the first element. But proving the second element, that is, breach, first requires ascertaining the contract's terms.

The rules of contract interpretation are well-established. "Once formed, a contract is construed according to the plain, ordinary meaning of the language used." *Fifth Third Bank v. McClure Props., Inc.*, 724 F. Supp. 2d 598, 603 (S.D. W. Va. 2010) (citing Syl. Pt. 9, *Arnold v. Palmer*, 686 S.E.2d 725 (W. Va. 2009)). After all, "[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract." Syl. Pt. 7, *Faith United Methodist Church & Cemetery of Terra Alta v. Morgan*, 745 S.E.2d 461 (W. Va. 2013) (quoting Syl. Pt. 3, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 128 S.E.2d 626 (W. Va. 1962)). Courts may only "interpret and enforce the agreement" as written. *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395, 401 (W. Va. 2008).

But contracts sometimes omit key terms. When that happens, courts must fill in the gaps with implied covenants, thereby effectuating the parties' intent. *Allen v. Colonial Oil Co.*, 115 S.E. 842, 844 (W. Va. 1923); *see also SWN Prod. Co. v. Kellam*, 875 S.E.2d 216, 226 (W. Va.

---

[23] For the sake of completeness, the essential elements "of a legal contract are competent parties, legal subject matter, valuable consideration and mutual assent." Syl. Pt. 3, *Dan Ryan Builders, Inc. v. Nelson*, 737 S.E.2d 550 (W. Va. 2012) (quoting Syl. Pt. 5, *Virginian Exp. Coal Co. v. Rowland Land Co.*, 131 S.E. 253 (W. Va. 1926)).

2022); *St. Luke's United Methodist Church v. CNG Dev. Co.*, 663 S.E.2d 639, 643 (W. Va. 2008). As relevant here, when the contract does not expressly provide an allotted time for performance, West Virginia law imposes an implied covenant to perform within a reasonable time. *Heartland, LLC v. McIntosh Racing Stable, LLC*, 632 S.E.2d 296, 306–07 (W. Va. 2006); *E. Shepherdstown Devs., Inc. v. J. Russell Fritts, Inc.*, 398 S.E.2d 517, 519 (W. Va. 1990); Syl. Pt. 2, *Chandler v. French*, 81 S.E. 825 (W. Va. 1914). Whether a given time is reasonable depends on the totality of the circumstances, including the task to be performed and the party's diligence in performing. *E. Shepherdstown Devs., Inc.*, 398 S.E.2d at 519–20; *Chandler*, 81 S.E. at 827.

Plaintiff's breach of contract claim is very narrow. Specifically, Plaintiff argues only that Defendant failed to pay it the $330,980.00 due for work Plaintiff performed under the binder agreement. (ECF No. 96 at 7–8.) Plaintiff *does not* argue that Defendant breached the binder agreement by reducing its allotted houses from 125 to 13. Nor does Plaintiff argue that Defendant breached the binder agreement by firing Plaintiff from the job before it could finish the ten houses it had already begun. Plaintiff only wants paid for the work it put into the project—a payment Defendant promised but never provided.

Defendant, on the other hand, denies any obligation to pay Plaintiff. According to Defendant, it need not pay Plaintiff because Plaintiff itself was the breaching party. (ECF No. 93 at 7–10.) Defendant identifies three supposed breaches by Plaintiff. First, Defendant argues that Plaintiff breached the contract because, rather than building 125 homes, Plaintiff "only worked on 14 [homes] and only completed 3."[24] (*Id.* at 4.) Second, Defendant contends that Plaintiff breached by not building the houses in a timely manner. (ECF No. 98 at 4.) Third, and finally,

---

[24] Defendant is apparently counting the fourteenth house where Plaintiff broke ground and was promptly fired.

Defendant claims that Plaintiff's decision to break ground on a new house after being told not to do so amounted to insubordination. (*Id.* at 3.) None of these arguments entitle Defendant to summary judgment.

Defendant's first argument is a non-starter for two reasons. First, the binder agreement allowed Defendant to reduce the number of houses assigned to Plaintiff at any time, and Defendant exercised that authority to reduce Plaintiff's allotment to 13 homes. That decision relieved Plaintiff of any obligation to build 125 homes—13 was the new target. Second, and relatedly, Plaintiff was only able to finish three of those 13 houses because Defendant fired Plaintiff. This is not, as Defendant tries to spin it, a case where Plaintiff threw up its proverbial hands and walked off the job. Plaintiff was instead continually progressing on the job—with three houses finished, two more almost done, and another eight under roof—when Defendant dismissed Plaintiff. Thus, Defendant's position that Plaintiff breached the binder agreement because it failed to finish the job when Defendant itself prevented Plaintiff from doing so is meritless.

Defendant's second argument also fails because the Court finds a genuine issue of material fact exists as to whether Plaintiff was performing in a timely manner. Here, the binder agreement provided no timeframe within which Plaintiff needed to have each house built, so the law provided Plaintiff with a reasonable time. *Heartland, LLC*, 632 S.E.2d at 306–07. Whether Plaintiff performed within "a 'reasonable period of time' [here] is . . . a question of fact" properly left to a jury. *Howell v. Appalachian Energy, Inc.*, 519 S.E.2d 423, 432 (W. Va. 1999). A reasonable jury could, on the one hand, conclude that Plaintiff took an unreasonable time to build each house, considering the sheer number of houses Plaintiff agreed to rebuild, Plaintiff's near-100-day per house average, and the urgency to rebuild post-flood. But on the other hand, a reasonable jury

could find that Plaintiff was performing within a reasonable time given the circumstances. Specifically, the record shows that in the few months Plaintiff worked on the RISE program, Plaintiff completed three houses, had a fourth house near-turn-key ready, a fifth 91% finished, and eight more under roof. This may not have been a blistering pace, but a jury could find it perfectly reasonable for a crew of six or so men. This is especially so, the Court believes, when considering that Plaintiff got stuck finishing another contractor's job on multiple houses and had Thompson routinely utilizing its workers for Thompson's side-jobs. For these reasons, the Court finds that a genuine issue of material fact exists whether Plaintiff was performing within a reasonable time.

Defendant's third argument—that Plaintiff was insubordinate—comes too late in the game. Defendant never raised, much less developed, this argument in its opening memorandum; Defendant instead waited until its reply to argue insubordination. This untimeliness is problematic for Defendant because "[t]he ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006); *see also Moseley v. Branker*, 550 F.3d 312, 325 n.7 (4th Cir. 2008) ("As a general rule, arguments not specifically raised and addressed in opening brief, but raised for the first time in reply, are deemed waived."). Defendant here offers no compelling reason why the Court should deviate from this rule and decide a potentially case-dispositive issue that received a mere three pages of discussion in one party's reply brief. The Court thus refrains from considering whether Plaintiff was insubordinate and deems this argument waived.

In sum, Defendant has failed to show as a matter of law that Plaintiff breached the binder agreement and thereby relieved Defendant of any obligation to pay Plaintiff. A reasonable jury

11

could therefore find that Defendant itself breached the terms of the binder agreement and thus owes Plaintiff. Summary judgment is therefore inappropriate on Plaintiff's breach of contract claim.

B. Fraud

The Court now turns to Plaintiff's fraud claim, wherein Plaintiff alleges that Defendant entered into the binder agreement without any intention of ever performing, *i.e.*, paying Plaintiff for materials and worked performed. (ECF No. 96 at 8–9.)

West Virginia law requires a plaintiff bringing a fraud claim to prove (1) that the defendant committed a fraudulent act (2) that was material and false, (3) which the plaintiff reasonably relied upon, and (4) that the plaintiff was damaged because he relied upon the fraudulent act. Syl. Pt. 5, *Kidd v. Mull*, 595 S.E.2d 308 (W. Va. 2004). However, when the alleged fraudulent act relates to a breach of contract, not every failure to follow through will do. *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 576–77 (W. Va. 2013) (per curiam). That is, "[f]raud cannot be predicated on a promise not performed." Syl. Pt. 3, *Croston v. Emax Oil Co.*, 464 S.E.2d 728 (W. Va. 1995) (quoting Syl. Pt. 1, *Love v. Teter*, 24 W. Va. 741 (1884)). Instead, the alleged fraudster "must have made 'a false assertion in regard to some *existing* matter by which a party is induced.'" *N. Ave. Cap., LLC v. Ranger Sci. LLC*, No. 2:23-cv-00015, 2024 WL 2097596, at *3 (S.D. W. Va. May 9, 2024) (emphasis in original) (quoting Syl. Pt. 2, *Gaddy Eng'g Co.*, 746 S.E.2d 568).

Here, Plaintiff's fraud claim fails as a matter of law because there is no record evidence tending to show that Defendant entered into the binder agreement without the intention of performing. To the contrary, the record shows that, up until early October when things soured

between the parties, Defendant regularly paid Plaintiff's invoices. Indeed, on some occasions, Defendant even fronted Plaintiff money ahead of schedule to keep Plaintiff afloat and fully funded. The mere fact that Defendant allegedly decided to shortchange Plaintiff—some seven months after signing the binder agreement—is insufficient to give rise to any inference of an intent to defraud. Plaintiff's fraud claim thus fails as a matter of law.

### C. Declaratory Judgment

That leaves Plaintiff's claim for a declaratory judgment. Defendant asks the Court to dismiss this claim because it is duplicative of Plaintiff's breach of contract claim. (ECF No. 93 at 12.) The Court agrees and finds dismissal appropriate. As the case now stands, the only relief the Court could grant Plaintiff via a declaratory judgment necessarily mirrors that relief available to Plaintiff under its breach of contract claim. As a result, Plaintiff's declaratory judgment claim is duplicative of its breach of contract claim and the Court must grant summary judgment on the declaratory judgment claim. *Cf. Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004).

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part. Counts II, III, IV, V, and VI of Plaintiff's complaint are hereby **DISMISSED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: June 4, 2024

13

_____
THOMAS E. JOHNSTON, CHIEF JUDGE